# UNITED STATES DISTRICT COURT

for the
Southern District of California



FILED
JAN 24 2018
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____ DEPUTY

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

3047 Highlands Boulevard, Spring Valley, California

Case No. 18MJ0350

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Attachment A, incorporated fully herein.

located in the ____Southern____ District of ____California____, there is now concealed *(identify the person or describe the property to be seized)*:

Attachment B, incorporated fully herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21 USC 841(a)(1), 846, 863, 856 | Possession of Controlled Substances with Intent to Distribute and Conspiracy, Drug Paraphernalia, Maintaining Drug Involved Premises |

The application is based on these facts:

See attached affidavit, incorporated fully herein.

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: ____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Karen Pokryfke, Special Agent, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 1/23/18

City and state: San Diego, CA

*Judge's signature*

Karen S. Crawford, United States Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I Karen Pokryfke, being duly sworn, states:

## TRAINING AND EXPERIENCE

1. I am a Special Agent Criminal Investigator for the United States Drug Enforcement Administration ("DEA"), and I am a law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7). I am empowered by law to conduct investigations and to make arrests for felony offenses. I was hired by the DEA in December of 2004 and I attended the DEA academy in Quantico, Virginia for approximately sixteen (16) weeks. At the DEA Academy, I was trained in all aspects of conducting narcotics investigation. I am currently assigned to the San Diego Field Division, Narcotics Task Force ("NTF") and have been since June 2013.

2. I have the following relevant training, qualifications, expertise, and experience. I have received formal and informal training in the controlled substance investigations in San Diego County and surrounding areas and have become familiar with the manner in which controlled substance investigations, including fentanyl, methamphetamine, cocaine, and marijuana, are packaged, marketed, cultivated and consumed. I have received training in the identification of all types of controlled substances by sight and odor. I have participated in over one hundred arrests for controlled substance violations. In the course of my present duties, I have become familiar with the manners and techniques of trafficking controlled substance as practiced locally. As a law enforcement officer for more than 10 years, I have received formal training, as well as extensive on-the-job experience and training, relative to the investigation of the importation, transportation, sales, manufacturing and distribution of

controlled substances. I have also participated in investigations that involved the use of electronic surveillance techniques. I have investigated illicit narcotic and controlled substances that have resulted in arrests, indictments, trials and convictions. While participating in these and other criminal investigations, I have executed search warrants on businesses, residences, vehicles and storage facilities. I have also participated in undercover operations that involved the sale, purchase, transportation and importation of controlled substances. I have participated in investigations in which drug traffickers also relied heavily upon telephone communication and other electronic devices as a means of communicating. I have interviewed individuals who have been directly and indirectly involved in the importation, transportation, distribution and manufacturing of illegal drugs and controlled substances.

3. Based on my training and experience, I have become familiar with the methods utilized in narcotics trafficking operations and the unique trafficking patterns employed by narcotics organizations. I have also spoken with senior agents as well as other senior law enforcement officers, about their experiences and the results of their investigations and interviews. I know that drug traffickers often require the use of a telephone facility to negotiate times, places, schemes and manners for importing, possessing, concealing, manufacturing and distributing controlled substances and for arranging the disposition of proceeds from the sales of controlled substances. I know that professional drug operations depend upon maintaining their extensive contacts. The telephone enables drug dealers to maintain contact with drug associates, drug suppliers and drug customers. I also know that drug traffickers sometimes use fraudulent information, such as nominee

2

names and false addresses, to subscribe to communication facilities, especially cellular phones, and frequently use communication facilities to thwart law enforcement efforts to intercept their communications.

4. Based on my training and experience, the presence of large amounts of butane is indicative of a butane honey oil (BHO) extraction laboratory. A BHO lab consists of marijuana plant material which is tightly packed into an extraction device such as a glass, plastic (PVC) or metal tube or a closed-loop extraction device. Then a type of solvent such as butane or acetone is introduced into the extraction device causing the Tetrahydrocannabinol (THC) from the marijuana plant material to be chemically extracted from the plant material. The THC then drips out of the bottom of the extraction device and into a holding container, typically cooking glassware. Heat is later applied to the substance to burn off the solvent used to extract the THC. The end product is a honey-like concentrated cannabis substance commonly referred to as "honey oil", "hash oil" or "wax."

## PURPOSE OF AFFIDAVIT

5. Based upon my participation in this investigation and the facts contained in this affidavit, I believe there is probable cause to believe that the subject premises as described in Attachment A contains: (a) evidence of a crime; (b) contraband, fruits of crime, or other items illegally possessed; and (c) property designed for use, intended for use, or used in committing a crime, specifically violations of Title 21, United States Code, Sections 841(a)(1) and 846 (Possession of Controlled Substances with Intent to Distribute and Conspiracy to Distribute Controlled Substances), Section 863 (Drug Paraphernalia), and Section 856 (Maintaining Drug Involved Premises).

3

Based on my own observations, and the observations of other law enforcement officers involved in this investigation, this affidavit is made in support of an application for a search warrant to search the following subject premises (the "**Subject Residence**"), as more fully described in Attachment A (incorporated herein), for the items to be seized, as more fully described in Attachment B (incorporated herein):

The garage, residence, outbuildings, and yard located at 3047 Highlands Boulevard, Spring Valley, California (the "**Subject Residence**").

## FACTS ESTABLISHING PROBABLE CAUSE

5. In June 2016, the DEA began investigating a global poly-drug distribution organization. Ellis McKinley White (WHITE) has been a subject of this ongoing investigation since November 2016. During the course of the investigation, I identified a public Facebook account "Ellis Green Thumb White" used by WHITE. The profile identifies WHITE with the date of birth of August 14. I know through the course of the investigation that WHITE's birthday is August 14, 1979. The public account displays numbers photos and videos featuring WHITE. It also displays federal court documents relating to a civil forfeiture case involving WHITE.

6. On Wednesday, January 10, 2018, I observed a video on WHITE's Facebook account, posted by "Ellis Green Thumb White," on Monday, January 8, 2018 with footage of what appeared to be finished honey oil.

7. On Thursday, January 18, 2018, I observed multiple videos posted between 10:39am and 6:19pm to WHITE's Facebook, by "Ellis Green Thumb White," featuring WHITE actively manufacturing honey oil by way of a Butane Honey Oil extraction laboratory. These videos appeared to have been posted on the Facebook account on January 13, 2018. Items

4

observed in the laboratory videos included a vacuum purge pot, a box of "Special Blue" Ultra-Pure Butane Fuel, and a glass dish of extracted honey oil. I also viewed a video which was posted to WHITE's Facebook account, by "Ellis Green Thumb White," on January 15, 2018, with the words "Urbangrower420…" in which WHITE recorded an image of his own face while in a living space. A subsequent video posted to WHITE's Facebook account, by "Ellis Green Thumb White," on January 16, 2018, features a jar of extracted honey oil being held in the same living space as the video from January 15, 2018. During this video, WHITE can be heard stating "That's that sauce." "Made that sauce." "Just waiting for the rocks to form in that mother-fuckin'…" "That's that sauce, awesome sauce." "See the rocks right there, that's the rocks right there at the bottom."

8. On the same date, I reviewed recorded video from a surveillance camera on January 13, 2018. A black male is observed walking in and out of the garage between 11:42am and 11:52am. Based on my investigation of WHITE, I believe this black male to be WHITE.

9. On January 23, 2017, at approximately 12:05pm, an agent drove by the **Subject Residence**. The garage door to the **Subject Residence** was open. Officer Ries observed the orange tubing and orange and chrome vacuum chamber inside the garage. For safety reasons, Agents and Task Force Officers contacted WHITE at the threshold to the garage, where WHITE was seated. Agents identified themselves with law enforcement identification and advised WHITE that Agents, through social media, knew of a Butane Honey Oil extraction lab located at the **Subject Residence**. WHITE immediately confirmed he possessed the BHO lab equipment; however, WHITE claimed the photos on social media were old photos that WHITE had retrieved from the memory in his phone and posted while he was in the

5

1  hospital. WHITE stated there was no electricity at the **Subject Residence**
2  and immediately accessed the vacuum chamber. Agents confirmed that, at
3  this time, electricity was out in the neighborhood. When WHITE accessed
4  the vacuum chamber, an agent observed an audible de-pressurization of
5  the vacuum chamber. Through my training and experience, and
6  communication with other law enforcement agents, I know that the vacuum
7  chamber is pressurized when the honey oil is being extracted. As a
8  result, I believe WHITE had been in the process of making honey oil on
9  the morning on January 23, 2018, before the electricity went out. I
10 also know that when this type of vacuum chamber is de-pressurized, the
11 released gas is butane gas, which is highly flammable and volatile.

## BASIS FOR EVIDENCE SOUGHT IN SEARCH WARRANTS

13     10.  Based upon my experience and training, consultation with other
14 law enforcement officers experienced in drug and financial
15 investigations, and all the facts and opinions set forth in this
16 affidavit, I know that:
17     11.  The process of operating a BHO lab requires a large amount of
18 butane to extract THC from marijuana plant material. When "blasting",
19 or running butane through the marijuana, a typical BHO lab operator will
20 utilize approximately 1-2 cans of butane per "run" depending on the size
21 of their extraction tube. If a closed-loop system is present, a
22 significant amount of butane will be introduced into the device to
23 charge the closed-loop system. This will allow the BHO lab operator to
24 keep the system pressurized with butane and to allow the butane to be
25 re-utilized within the system for a number of "runs." Based on the
26 volatility of butane and the process of extracting THC from marijuana
27 plant material, there is a substantial risk to public safety in regards
28 to a causing a fire and/or explosion as butane is a highly flammable

substance which is both odorless and colorless. It is unknown to me why a subject would possess large quantities of butane other than operating a BHO lab. A legitimate use for butane is to refill cigarette lighters, however, a single can of butane (300ml) will fill a cigarette lighter (5ml) approximately 60 times.

12. Individuals involved in drug dealing or manufacturing will often maintain at their residence and/or place of business quantities of controlled substances, as well as paraphernalia for packaging, weighing, cutting, testing, distributing, and identifying controlled substances.

13. Individuals involved in drug dealing or manufacturing often maintain at the residence and/or place of business documents containing data reflecting or memorializing the ordering, possession, purchase, storage, distribution, transportation and/or sale of controlled substances, including buyer lists, seller lists, pay-owe sheets, records of sales, log books, drug ledgers, personal telephone/address books containing the names of purchasers and suppliers of controlled substances, electronic organizers, Rolodexes, telephone bills, telephone answering pads, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records and key(s). At times, the drugs may be sold, but documentary records and ledgers often remain for long periods of time to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers, and coconspirators.

14. Individuals involved in drug dealing or manufacturing must often rely on others to obtain the drugs and help them market the drugs

and evidence of the identities of these criminal associates is often maintained at their residence and/or place of business.

15. Individuals involved in drug dealing or manufacturing utilize mobile telephones to maintain contact with coconspirators and to conduct their criminal activity. Cellular telephones used in this fashion contain data concerning telephonic contact with co-conspirators as well as phone books containing telephone numbers for co-conspirators. Therefore, I request authorization to seize all mobile telephones found at the locations to be searched and to search the telephones' electronic phone books, date books, and records of telephonic contacts, including text, picture, and voice messages, to include all mobile telephone accessories, including, but not limited to, batteries and phone chargers, SIM cards, and pre-paid phone cards. Any such seizure of cellular telephones will be subject to the Protocol described below.

16. Based on prior searches of premises used by individuals involved in drug dealing or manufacturing, I believe that I will find articles of personal property evidencing the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises or property therein.

17. Individuals involved in drug dealing or manufacturing will often conceal evidence of their drug dealing or manufacturing, to include drug-related documents and ledgers, in vehicles outside their residence in order to prevent detection and seizure by officers conducting search warrants at the residence. Therefore, I am requesting permission to search all vehicles located on the premises associated with the respective Target Location and residents.

18. Individuals involved in drug dealing or manufacturing earn sums of money and often try to legitimize these profits. In order to

do this they attempt to secret, transfer and conceal the money by, among other ways: (1) placing assets in names other than their own to avoid detection while maintaining control; (2) laundering the money through what appears to be a legitimate business or businesses; (3) hiding money in their homes, business locations, safes and safety deposit boxes; or (4) using the money to buy assets which are hard to trace. Records of these transactions, to include banking and financial institution records, bank statements, credit card statements, canceled checks, money orders, deposit slips, orders for or receipt of money transfer by wire, checking and saving books, financial institution statements, safe deposit boxes, loan statements, tax returns, business and personal ledgers, and accounting records, are often found at their residence and/or place of business.

19. Individuals involved in drug dealing or manufacturing will often maintain weapons, firearms and ammunition on their person or at their residence and cars in order to protect themselves and guard their drugs and drug profits, and for enforcement purposes during their drug dealings. These weapons and firearms are used and can be used as an instrumentality of the crime of possession and distribution of drugs. Therefore, I am requesting permission to seize weapons, firearms, magazines, and ammunition that may be found at the above-described locations.

20. Individuals involved in drug dealing or manufacturing often take photographs of themselves, their associates, their property, and their controlled substances. Drug traffickers often maintain these photographs at their residences or in their vehicles. Therefore, I am requesting permission to search the residences listed within this

warrant and its attachment(s) for and to seize photographs that law enforcement agents determine to be of evidentiary value.

21. It is also my opinion and belief that the above-described documents are permanently possessed by drug dealing or manufacturing much the same way a legitimate business will maintain records and tools of its trade whether or not the business has a particular item in inventory on a given date. These documents are kept by drug traffickers whether or not the trafficker is in possession of any drugs at any given moment. I believe that the seizure of such documents will provide evidence of the events set forth in this affidavit and that such documents can be found in the search locations to be searched despite any lapse of the time between the events described and the anticipated search pursuant to this warrant.

22. Based upon my experience and training, consultation with other law enforcement officers experienced in drug and financial investigations, and all the facts and opinions set forth in this affidavit, I believe that the items set forth in Attachment B, which evidence violations of Title 21, United States Code, Sections 841(a)(1) and 846 (Possession of Controlled Substances with Intent to Distribute and Conspiracy to Distribute Controlled Substances), Section 863 (Drug Paraphernalia), and Section 856 (Maintaining Drug Involved Premises) will be found at the **Subject Residence.**

### CELLPHONE PROTOCOL

23. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as

10

personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

24. Following the issuance of this warrant, I will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

25. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may

11

take weeks or months.  The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

Dated: January 23, 2018

_____
KAREN POKRYFKE
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me this 23rd day of January, 2018.

_____
HONORABLE KAREN S. CRAWFORD
UNITED STATES MAGISTRATE JUDGE

12

## ATTACHMENT "A"

<u>DESCRIPTION OF PROPERTY TO BE SEARCHED</u>

The garage, residence, outbuildings, and yard located at 3047 Highlands Boulevard, Spring Valley, California 91977 ("**Subject Residence**"), including the storage areas, safes, briefcases, containers, and trash areas within the residence; the yard immediately assigned to or part of the premises, and all vehicles and persons located on the premises in or on which items to be seized could be concealed.

The **Subject Residence** is more fully described as: A tan semi-detached townhome in a five-unit complex with white trim, and white garage door with brown-shingled roof. The unit is labeled with black numbering "3047" to the east of the garage door. The white wooden side gate is facing north and there is an open space to the west of the unit. There are bushes dividing the driveway to the east and a tree in the open space to the west.

Below is a photograph of the **Subject Residence** (right side of duplex):



**ATTACHMENT "B"**

The evidence to be seized from the Subject Premises described in Attachment A, which constitute evidence of violations of Title 21, United States Code, Sections 841(a)(1), 846, 863, 856:

1. All controlled substances, including marijuana and compounds containing derivatives of marijuana such as hashish and hashish oil;

2. Paraphernalia/Equipment used for the manufacturing, sale, and use of all controlled substances, including marijuana and marijuana derivatives, including hollow tubes or other items commonly known as "extraction vessels," filters, glass pipes, bongs, rubber tubing, glassware, heating mantels, vacuum pumps, vacuum pressure devices, vacuum ovens, condensers and closed-loop extraction devices;

3. Precursor chemicals such as the solvents butane, propane, isopropyl alcohol, hexane, $CO_2$;

4. Documents containing data reflecting or memorializing the ordering, possession, purchase, storage, distribution, transportation and sale of controlled substances, including buyer lists, seller lists, pay owe sheets, records of sales, log books, drug ledgers, personal telephone/address books containing the names of purchasers and suppliers of controlled substances, electronic organizers, Rolodexes, telephone bills, telephone answering pads, bank and financial records, and storage records,

such as storage locker receipts and safety deposit box rental records and key;

5. Money, assets, and evidence of assets derived from or used in the purchase of controlled substances and records thereof, including but not limited to United States currency, negotiable instruments and financial instruments including stocks and bonds, and deeds to real property, books, receipts, records, bank statements and records, business records, money drafts, money order and cashier's checks receipts, passbooks, bank checks, safes and records of safety deposit boxes and storage lockers;

6. Documents and articles of personal property reflecting the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises to be searched or property therein, including keys, rental agreements and records, property acquisition records, utility bills and receipts, photographs, answering machine tape recordings, telephone, vehicle and/or vessel records, canceled mail envelopes, correspondence, financial documents such as tax returns, bank records, safety deposit box records, canceled checks, and other records of income and expenditure, credit card records, travel documents, personal identification documents and documents relating to obtaining false identification including birth certificates, driver's license, immigration cards and other forms of identification which the same would use other names and identities other than his or her own;

7. All incoming telephone calls received at the residence during the execution of the search warrant and all calls received on cellular telephones found during the execution of the warrant;

8. Devices used to conduct counter surveillance against law enforcement, such as radio scanners, police radios, surveillance cameras and monitors and recording devices and cameras;

9. Photographs and video and audio recordings which document an association with other coconspirators and/or which display narcotics, drug paraphernalia, firearms, or money and proceeds from narcotics transactions;

10. Pagers, cellular telephones, facsimile machines, telephone answering machines, Caller ID system, and prepaid telephone cards;

11. Travel documents including itineraries, airline tickets, boarding passes, motel and hotel receipts, rental car receipts, passports and visas, credit card receipts, shipping and receiving documents relating to the delivery of packages;

12. Banking and financial institution records, bank statements, credit card statements, canceled checks, money orders, deposit slips, orders for or receipt of money transfer by wire, checking and saving books, financial institution statements, safe deposit boxes, loan statements, tax returns, business and personal ledgers, and accounting records;

13. Records relating to the lease of storage lockers,

telephone/address directories and other papers containing telephone numbers and addresses;

15. With respect to any and all electronically stored information in cellular phones, the seizure and search of the cellular telephones will be conducted in accordance with the affidavit submitted in support of the warrant. Agents may access, record, and seize the following in the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone:

    b. Communications, records, or data including but not limited to emails, text messages, photographs, audio files, videos, or location data:

        i. relating to or memorializing the manufacture or dealing of controlled substances, including, but not limited to: phone logs, messages, photos, contact lists, and financial records;

        ii. tending to identify other facilities, storage devices, or services- such as email addresses, IP addresses, phone numbers-that may contain electronic evidence tending to indicate the manufacture or dealing of controlled substances;

        iii. tending to identify co-conspirators, criminal associates, or others involved in the manufacture or dealing of controlled substances;

        iv. tending to identify presence at locations

involved in the manufacture or dealing of controlled substances such as other labs or stash houses or load houses;

v. tending to identify the user of, or persons with control over or access to, the subject items; or

vi. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above;

vii. any other electronic information in the stored memory and/or accessed by the active electronic features of the digital or cellular phone including but not limited to photographs, videos, email, and voice mail.